UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
POLICY ADMINISTRATION SOLUTIONS,
INC.,

                                Plaintiff,                          **OPINION & ORDER**

   - against -                                        No. 15-CV-2473 (CS)

QBE HOLDINGS, INC. and QBE AMERICAS,
INC.,

                                Defendants.
-------------------------------------------------------------x

<u>Appearances:</u>
David K. Fiveson
Claudia G. Jaffe
Butler, Fitzgerald, Fiveson, & McCarthy, PC
New York, New York
*Counsel for Plaintiff*

Jason R. Fathallah
Mark F. Foley
von Briesen & Roper, s.c.
Milwaukee, Wisconsin

Leonard F. Lesser
Simon Lesser PC
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

      Before the Court is the motion to compel arbitration and stay proceedings of Defendants QBE Holdings, Inc., and QBE Americas, Inc., (collectively "QBE"). (Doc. 120.) For the reasons set forth below, Defendants' motion is GRANTED.

I.  **BACKGROUND**

   A.  **Facts**

The following facts are taken from the pleadings and the declarations submitted in support of and opposition to the instant motion.[1]  Defendants QBE Holdings, Inc., and QBE Americas, Inc., are Delaware corporations doing business in New York.  (Doc. 20 ("AC") ¶¶ 2-3.)  Plaintiff Policy Administration Solutions, Inc. ("PAS") is a New York corporation doing business in New York.  (*Id.* ¶ 1.)  Plaintiff is the author of pasExecutive.Net (the "Software"), a software system "used by insurance companies to calculate underwriting risks and price insurance policies according to those risks."  (*Id.* ¶ 8.)  Defendants are engaged in the business of underwriting insurance and were licensed by PAS to use pasExecutive.net.  (*Id.* ¶¶ 15-16.)

   1.  **License Agreement and Confidentiality Agreement**

On August 22, 2005, Clarendon Insurance Group, Inc. ("Clarendon") entered into a License Agreement under which Plaintiff granted Clarendon a license to use the Software.  (License Agreement.)[2]  Clarendon and Plaintiff also entered into a maintenance agreement under which Plaintiff would provide support services.  (Doc. 122 ("Fathallah Aff.") Ex. C ("Maintenance Agreement").)  The License Agreement contemplated that after initial installation

---

[1] "Courts deciding motions to compel [arbitration] apply a standard similar to that applicable for a motion for summary judgment," so "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and alterations omitted); *see Philippe v. Red Lobster Rests. LLC*, No. 15-CV-2080, 2015 WL 4617247, at *2 (S.D.N.Y. Aug. 3, 2015) ("It is . . . proper (and in fact necessary) to consider extrinsic evidence when faced with a motion to compel arbitration . . . .") (internal quotation marks omitted).

[2] Citations to "License Agreement" refer to Doc. 122-1, which contains pages 1 through 8 of the License Agreement, and Doc 122-2, which contains pages 9 through 13 of the License Agreement and Amendment 1.

of and training on the Software – which came to be known as the "First Instance" – Clarendon and Plaintiff would execute Statements of Work for subsequent services. (License Agreement § 3.3.)

The License Agreement includes an arbitration clause that provides: "In the event that the parties are unable to resolve a dispute relating to this Agreement, the parties hereby agree to binding arbitration in New York City, New York pursuant to the Rules of the American Arbitration Association [("AAA")] at New York City, New York." (*Id.* § 9.6.) Section 4 of the License Agreement, entitled "Proprietary Rights, Trade Secrets and Copyright," contains various provisions governing each party's rights and obligations regarding the other's party's confidential information. (*Id.* §§ 4.1-4.10.)

On September 8, 2005, Clarendon and Plaintiff purportedly executed a Confidentiality Agreement. (Fathallah Aff. Ex. B ("Confidentiality Agreement").) Defendants dispute the authenticity and enforceability of this document.[3] The Confidentiality Agreement is an agreement "by and between CLARENDON INSURANCE GROUP, INC., a Delaware

---

[3] Defendants note that the Clarendon representative who allegedly signed the document testified that "he could not recall ever seeing the Confidentiality Agreement prior to the onset of litigation with PAS and that he did not remember signing the agreement." (Ds' Mem. at 16; *see* Fathallah Aff. Ex. FF at 1089:21-90:3.) According to Defendants, they searched through "hundreds and thousands of e-mails and documents potentially related to this case, but [did] not [find] any mention of the alleged 'Confidentiality Agreement.'" (Fathallah Aff. ¶ 21.) Further, Defendants' handwriting expert "submitted a report and provided testimony that the Confidentiality Agreement may not be genuine," (Ds' Mem. at 16; *see* Fathallah Aff. Ex. GG at 998:7-15, Ex. HH at 7-9, 46-56), and its forensic-documentation expert reported that the pages of the Confidentiality Agreement were prepared at different times and cobbled together, (Ds' Mem. at 16-17; *see* Fathallah Aff. Ex. II at 1194:21-95:7, Ex. JJ at 8-9).

Defendants further argue that even if the Confidentiality Agreement is authentic, it does not bind Defendants because neither they nor their predecessors-in-interest were a party to it or an affiliate of Clarendon either when the contract was made or when Defendants assumed their predecessors' interests. (Ds' Mem. at 14-16.)

corporation . . . on behalf of itself and its subsidiaries and affiliates ("CLARENDON") and Policy Administration Solutions." (*Id.* pmbl.) The Confidentiality Agreement contains a merger clause, entitled "Entire Agreement," which provides:

> This Agreement shall supersede and prevail over any other prior agreements, either oral or written, as to [PAS] Confidentiality Information received under this agreement. The Agreement constitutes the entire agreement between the parties on the subject matter of this Agreement and shall not be amended, except in writing signed by an officer of both parties.

*Id.* ¶ 9.

The Confidentiality Agreement does not contain an arbitration clause but rather contains a "Governing Law" provision, which states:

> This Agreement shall be construed according to the laws of the State of New York without regard to principles of conflict of laws. The courts of the State of New York, to the personal jurisdiction of which each party to this Agreement voluntarily submits, shall have the exclusive jurisdiction to hear and decide and [*sic*] dispute or controversy concerning this Agreement.

*Id.* ¶ 10.

### 2. The Creation of Praetorian and Its Sale to QBE

On October 26, 2005, Praetorian Financial Group, Inc. ("Praetorian") was incorporated. (Fathallah Aff. Ex. D at 2.) In October 2006, Praetorian, Clarendon, and Plaintiff executed Amendment 1 to the License Agreement and Maintenance Agreement, (License Agreement amend. 1), which changed the licensee from Clarendon to Praetorian and provided that "[a]ll obligations of Licensee, including but not limited to payment obligations, in connection with the Agreement and the Software Maintenance Agreement are transferred to Praetorian, except that Clarendon shall remain bound by the provisions of the Agreement relating to Confidential Information," (Fathallah Aff. Ex. D at 2).

On December 13, 2006, Hannover Re, the parent company of Praetorian and Clarendon, agreed to sell Praetorian to QBE Insurance Group Ltd., (*id.* Ex. E at 5),[4] and on March 30, 2010, QBE Holdings, Inc. and Praetorian merged and QBE Holdings Inc. survived, (*see id.* Ex. D at 2-3). Defendants thereby "assume[d Praetorian's] liabilities and obligations." (*Id.* Ex. D at 3.)

### 3. QBE's Alleged Modification of PAS's Code and the Second Instance

On December 15, 2010, Plaintiff informed Defendants that it believed that Defendants had made unauthorized changes to the Software in violation of the Maintenance Agreement. (*Id.* Ex. H.) Plaintiff (but not Defendants) executed an amendment to the Maintenance Agreement extending maintenance services to the new version of the Software (the "Second Instance"). (*Id.* Ex. L.) Defendants directed Plaintiff to suspend performance on all open Statements of Work sometime before May 30, 2014, (*id.* Ex. M at 2-3), and on July 3, 2014, Defendants sent Plaintiff written notice that Defendants were "terminating all software maintenance services for the [F]irst [I]nstance . . . effective August 22, 2014," (*id.* Ex. N at 3). Four days later, Plaintiff advised Defendants that Plaintiff considered the termination "a breach of the agreement" because the Maintenance Agreement's term renewed for one year to June 2015 when Defendants "fail[ed] to provide 30 day notice of termination by May 2014." (*Id.* Ex. O at 2.)

On October 14, 2014, Plaintiff's counsel sent Defendants' counsel a letter stating that Defendants breached the License Agreement by failing to sign the Maintenance Agreement and failing "to pay the maintenance due October 1, 2014." (*Id.* Ex. P at 2.) Plaintiff stated that if Defendants did not pay, Plaintiff would terminate the license for the Second Instance and Defendants would have to "return to [Plaintiff] all materials and documentation containing

---

[4] Where Exhibits to the Fathallah Aff. are not internally paginated, citations refer to the page numbers generated by the Court's ECF system.

5

confidential information and certify in writing that [they have] complied." (*Id.*) Defendants accepted Plaintiff's termination and stated that they would "return *or destroy* all materials containing Confidential Information (as defined in the License Agreement) within 60 *business* days of October 20, 2014. (*Id.* Ex. Q at 2 (emphases in original).) Plaintiff "confirm[ed] Defendants'] understanding of [their] obligation . . . as correct." (*Id.* Ex. R at 2.) On December 11, 2014, Plaintiff sent the Confidentiality Agreement to Defendants and requested that they "return . . . [Plaintiff's] confidential information, as opposed to . . . merely certifying the destruction of the information." (*Id.* Ex. U at 2.) On June 11, 2015, Plaintiff sent to Defendants a "copy of the complete and signed [C]onfidentiality [A]greement." (*Id.* Ex. W at 2.)

### B. Procedural History

Plaintiff filed the instant action on April 1, 2015, (Doc. 1), and amended the complaint on June 16, 2015. (AC.) In Counts One and Two of the AC, Plaintiff asserts claims under § 502(a) of the Copyright Act, 17 U.S.C. § 502(a), that Defendants failed to return and continue to use confidential information provided in connection with the First and Second Instances, thereby infringing Plaintiff's copyright and breaching the License Agreement. (*Id.* ¶¶ 66-70, 72-74.) In Count Three, Plaintiff alleges that Defendants breached the License Agreement. (*Id.* ¶¶ 76-78.) In Count Four, Plaintiff seeks attorney's fees and costs under the § 505 of the Copyright Act, 17 U.S.C. § 505, (*id.* ¶¶ 80-82), and in Count Five, Plaintiff seeks statutory damages under § 504(c)(2) for willful copyright violation, (*id.* ¶¶ 84-86). In Count Six, Plaintiff alleges that Defendants breached the Confidentiality Agreement by breaching "Plaintiff's copyright interest in the System" and their "obligations to return Confidential Information." (*Id.* ¶ 89.) In Count Seven, Plaintiff alleges that Defendants were unjustly enriched "by the retention and use of Confidential Information for the System for the First and Second Instance." (*Id.* ¶ 91.)

On August 28, 2015, this Court entered an *ex parte* order to show cause and temporary restraining order ("TRO") enjoining Defendants from destroying Plaintiff's confidential information provided in connection with the Second Instance. (Doc. 34.) I denied Plaintiff's motion for a preliminary injunction and vacated the TRO on September 3, 2015, following oral arguments. (Minute Entry dated Sept. 3, 2015.)

On November 5, 2015, the parties completed briefing on Defendants' motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 70-76.) After a hearing, I denied Defendants' motion without prejudice to renewal pending the resolution of state court proceedings related to an arbitration award arising out of Defendants' alleged breaches of the Maintenance Agreement and several Statements of Work,[5] (Minute Entry dated Apr. 28, 2016), and, as discussed at the hearing, I stayed proceedings in this case.

---

[5] On July 23, 2014, Plaintiff sued Defendant QBE Holdings, Inc. in the Supreme Court of the State of New York, alleging that Defendant breached six Statements of Work related to the Second Instance. (Fathallah Aff. Ex. X ¶¶ 9-44.) Plaintiff also alleged that Defendant breached the Maintenance Agreement by failing to pay maintenance fees. (*Id.* ¶¶ 45-51.) On June 23, 2015, the state court entered an order compelling arbitration. (*Id.* Ex. Y at 3.) On March 29, 2016, an AAA arbitrator issued a Decision and Award (the "Award") denying Plaintiff's claims and Defendant's counterclaims, (*id.* Ex. Z at 37), and finding that the Confidentiality Agreement was not enforceable against Defendant, (*id.* Ex. Z at 30 ("[T]he application of the Confidentiality Agreement's terms was limited to the party who executed it, Clarendon.")).

On October 31, 2016, the state court vacated the arbitration award and remanded to the arbitrator on the ground that Defendant committed misconduct when it failed to disclose that one of its witnesses had entered into a plea agreement on a federal wire fraud charge. (*Id.* Ex. AA at 5-9; *see* N.Y. C.P.L.R. § 7511(b)(1)(i).) On August 21, 2017, the state court vacated that order in part and remanded the arbitration to the AAA to "determine under [its] rules whom shall preside over the matter upon remand." (Fathallah Aff. Ex. BB at 4) (internal quotation marks omitted).) The Appellate Division affirmed. *Policy Admin. Sols., Inc. v. QBE Holdings, Inc.*, 76 N.Y.S.3d 135, 136 (App. Div. 2018).

On May 9, 2018, the AAA "reaffirmed" the original arbitrator as the arbitrator for the remanded case. (Fathallah Aff. Ex. CC at 1.) On May 22, 2018, the state court granted Plaintiff's motion to stay the arbitration in state court, (*see id.* Ex. DD at 8:2-10), on the ground that the court "didn't intend to send it back to [the original arbitrator]," (*id.* Ex. DD at 3:16-17).

7

On July 20, 2018, Plaintiff moved to vacate the stay in this Court, (Doc. 102), and I lifted the stay on August 13, 2018, following a pre-motion conference, (Minute Entry dated Aug. 13, 2018). On January 11, 2019, following pre-motion letters, (Docs. 106, 108), and a pre-motion conference, (Minute Entry dated Sept. 17, 2018), Defendants filed the instant motion, (Doc. 120). Defendants filed a memorandum of law in support of the motion, (Doc. 121 ("Ds' Mem.")), and the Fathallah Affidavit, (Fathallah Aff.), with its exhibits, (Docs. 122-1 to 122-38). Plaintiff filed a memorandum of law in opposition, (Doc. 123 ("P's Opp.")), counsel's affirmation with exhibits, (Docs. 125, 125-1 to 125-3), and the affidavit of a former QBE Holdings employee with exhibits, (Docs. 126, 126-1 to 126-7). Defendants also filed a reply memorandum in further support of their motion to compel arbitration. (Doc. 127.)

## II. <u>LEGAL STANDARD</u>

"In the context of motions to compel arbitration, . . . the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of

---

The Appellate Division affirmed, holding that a new arbitrator should hear the remanded arbitration. *Policy Admin. Sols., Inc. v. QBE Holdings, Inc.*, 95 N.Y.S.3d 816 (App. Div. 2019).

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

### III. DISCUSSION

#### A. Arbitrability

Arbitration clauses are subject to the Federal Arbitration Act ("FAA"). *See Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010). "The [FAA] allows parties to agree by contract that an arbitrator, rather than a court, will resolve . . . underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). Under Section 2 of the FAA

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). To

9

determine whether an action is arbitrable under the FAA, a district court must resolve four inquiries: (1) "whether the parties agreed to arbitrate"; (2) "the scope of [the arbitration] agreement"; (3) "whether Congress intended those claims to be nonarbitrable"; and (4) "if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987).

> In accordance with the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation marks and citation omitted).

Plaintiff argues that this dispute is not arbitrable. (P's Opp. at 15-19.) "The law generally treats arbitrability as an issue for judicial determination 'unless the parties clearly and unmistakably provide otherwise.'" *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "[W]hen the parties explicitly incorporate into an arbitration agreement the AAA's Commercial Arbitration Rules, including a rule which empowers the arbitrator to rule on her own jurisdiction, 'the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 104-05 (S.D.N.Y. 2017) (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005)). Thus, "a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules" may not "disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Contec Corp.*, 398 F.3d at 211 (emphasis in original); *see Gwathmey*

10

*Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 518 F. App'x 20, 21 (2d Cir. 2013) (summary order) ("[B]y incorporating the American Arbitration Association ('AAA') rules the parties agreed to have the arbitrators decide arbitrability."); *Jacobs v. U.S. Anti-Doping Agency*, No. 04-CV-1163, 2004 WL 5003951, at *4 (S.D.N.Y. May 19, 2004) (where arbitration provision incorporated AAA rules, "the parties . . . agreed that all questions regarding the existence, validity, and scope of their arbitration agreement should be decided by an AAA arbitrator rather than by a court"), *aff'd sub nom. Jacobs v. USA Track & Field*, 374 F.3d 85 (2d Cir. 2004).

The License Agreement's arbitration clause provides that, "[i]n the event that the parties are unable to resolve a dispute relating to this Agreement, the parties . . . agree to binding arbitration in New York City, New York pursuant to the Rules of the American Arbitration Association." (License Agreement § 9.6.)[6] Rule 7 of the AAA Commercial Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, Commercial Arbitration Rules & Mediation Procedures 7(a). Thus, the incorporation of the AAA Rules into the License Agreement serves as clear and unmistakable evidence that, for disputes relating to the License

---

[6] "The Second Circuit has directed courts to classify arbitration clauses as either broad or narrow." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 99 (S.D.N.Y. 2015). An arbitration clause covering "any claim or controversy arising out of or relating to" an agreement is "the paradigm of a broad clause," *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (internal quotation marks and alterations omitted) – "broader than one covering all claims and disputes arising under the contract," *Spinelli*, 96 F. Supp. 3d at 100 (internal quotation marks and alterations omitted). And "an arbitration clause covering claims 'relating to' a contract is broader than a clause covering claims 'arising out of' a contract." *Armor All/STP Prods. Co. v. TSI Prods., Inc.*, 337 F. Supp. 3d 156, 168 (D. Conn. 2018) (internal quotation marks omitted). The License Agreement contains a broad arbitration provision.

Agreement, the parties agreed to delegate any questions of arbitrability to the arbitrator.[7] *See Contec Corp.*, 398 F.3d at 208; *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, No. 14-CV-764, 2015 WL 1442487, at *5 (S.D.N.Y. Mar. 27, 2015), *stay denied*, 2015 WL 3756849 (S.D.N.Y. May 29, 2015).

Plaintiff urges that "[t]here is no currently operative agreement to arbitrate [its] copyright claims," (P's Opp. at 16), because "[c]laims concerning [Plaintiff's] confidential information, including [Plaintiff's] copyright claims . . . , fall squarely under the Confidentiality Agreement," which does not contain an arbitration provision, (*id.* at 18). The Confidentiality Agreement contains a governing law provision, which Plaintiff contends supersedes any agreement to arbitrate disputes regarding confidential information. (*Id.* at 9; *see id.* at 17 (quoting Confidentiality Agreement § 9 ("Entire Agreement. This Agreement shall supersede and prevail over any prior agreements, either oral or written as to [Plaintiff's] Confidentiality Information received under this agreement.")).)

"Whether the forum-selection clause in the [Confidentiality] Agreement supersedes the arbitration clause in the [License] [A]greement[] presents a question of arbitrability," *TAPCO Underwriters, Inc. v. Catalina London Ltd.*, No. 14-CV-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014) (citing *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2014)), which, as discussed, is a question for the arbitrator, *see Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 415 (E.D.N.Y. 2014) (declining to address argument

---

[7] Plaintiff argues that Defendants have not met their burden of showing the existence of an arbitration agreement. (P's Opp. at 16-17.) But Defendants have met this burden by proffering the License Agreement, the validity of which Plaintiff does not dispute. The question is whether Plaintiff has met its burden of showing that the arbitration clause therein is inapplicable to Plaintiff's claims. *See Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) ("A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid.").

that claims do not "arise out of" agreement containing arbitration provision where parties incorporated AAA rules); *Maisel v. McDougal Littell*, No. 06-CV-765, 2006 WL 1409019, at *3 (S.D.N.Y. May 22, 2006) ("Whether the scope of the arbitration clause can be construed to include copyright infringement claims is an issue for the arbitrator as well because the arbitration clause incorporates the rules of the AAA.") (citations omitted).

Plaintiff further argues that its claims are not arbitrable because they do not "relate to" the License Agreement and instead fall under the Confidentiality Agreement. (P's Opp. at 18; *see id.* at 14.) There are several problems with this argument. First, Plaintiff reads the arbitration clause too narrowly when it argues that its copyright claims do not require interpretation of the License Agreement and therefore are not claims "regarding" the License Agreement. (*Id.* at 14.) The arbitration clause at issue here is not limited to claims "regarding" or "arising under" the License Agreement, but extends as broadly as possible to claims "relating to" that Agreement. (*See* note 5 above.) Plaintiff's citation to cases interpreting "arising out of" and "regarding" thus does not aid it.[8] Second, whether a claim falls within the scope of an

---

[8] Indeed, the cases Plaintiff cites aid Defendants. *Phillips v. Audio Active Ltd.* notes that copyright claims can arise out of a contract, how a plaintiff pleads the claim does not control, and a clause requiring arbitration of claims "relating to" a contract is broader than one requiring arbitration of claims "arising out of" that contract. *See* 494 F.3d 378, 389-392 (2d Cir. 2007). *Cocona, Inc. v. Columbia Sportswear Co.* similarly acknowledges that a clause in a non-disclosure agreement requiring arbitration of claims "regarding this [a]greement," like a clause using the term "arising under," would mandate arbitration of claims requiring interpretation of the contract, but found no such requirement because the claims had no relation to the confidential information exchanged under the contract. *See* No. 17-CV-1195, 2017 WL 4029860, at *3-4 (D. Colo. Sept. 12, 2017). It does not purport to interpret "relating to" or a contract that contains confidentiality provisions, like the License Agreement here, that are liberally cited in the Complaint. (*See* AC ¶¶ 19-23.) Further, both cases interpret forum-selection clauses, not arbitration clauses, and therefore they do not take into account the strong federal policy in favor of arbitration. *See Phillips*, 494 F.3d at 389-90.

13

arbitration clause is a question of arbitrability, *Jacobs*, 2004 WL 5003951, at *2, and therefore in this case within the purview of the arbitrator.

Plaintiff cites a Tenth Circuit case applying Florida and Kansas law. (*See* P's Opp. at 18 (citing *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775 (10th Cir. 1998).) Not only is that case not binding, but there – unlike here – there was no "clear and unmistakable evidence that the parties intended to have an arbitrator, rather than a court, decide whether an arbitration agreement exists or what the scope of that agreement is." *Riley Mfg. Co.*, 157 F.3d at 780 (internal quotation marks omitted). Plaintiff cites another out-of-Circuit case, *Desktop Images, Inc. v. Ames*, 929 F. Supp. 1339 (D. Colo.), *stay denied*, 930 F. Supp. 1450 (D. Colo. 1996), for the proposition that a party cannot compel arbitration where a "copyright owner and its licensee did not agree in writing to arbitrate the issues underlying the action" – namely, claims arising under the Copyright Act, (*see* P's Opp. at 18). But *Desktop Images* does not address whether questions of arbitrability are for the court or the arbitrator. Further, *Desktop Images* interprets a clause mandating arbitration of claims "arising under" the licensing agreement, and "[t]he court itself distinguished an arbitration clause in another case which was broader and included claims 'arising out of' as well as those 'relating to' the agreement, as here." *Witness Insecurity, LLC v. Hale*, No. 12-CV-293, 2013 WL 12162297, at *5 (E.D.N.C. Sept. 27, 2013) (citing *Desktop Images*, 929 F. Supp. at 1345, and collecting cases finding *Desktop Images* inapplicable to broad arbitration clauses).[9]

---

[9] In any event, even if it were not a question for the arbitrator, I agree with Defendants that "[a]ny copyright claim based on [Defendants'] alleged modification of [Plaintiff's] code" or retention and use of confidential information – that is, Counts One, Two, and Four through Seven – "is, at bottom, a licensing dispute involving the parties' respective rights and duties under the License Agreement." (Ds' Mem. at 20.) Each of those claims refers to Defendants' alleged retention, use, or modification of information provided to them in connection with the

Thus, I decline to decide whether Plaintiff's claims are arbitrable. Whether these claims are subject to arbitration "is a matter of the [License] Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause." *Contec Corp.*, 398 F.3d at 211.[10]

B. **Waiver**

Plaintiff argues that, even if its claims are arbitrable, Defendants waived arbitration. (P's Opp. at 22-25.) "Federal policy strongly favors arbitration as an alternative means of dispute resolution." *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997). "This arbitrability presumption means that any doubts concerning whether there has been a waiver of arbitration are resolved in favor of arbitration and are not to be lightly inferred." *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, No. 16-CV-7126, 2018 WL 6618389, at *3 (S.D.N.Y. Dec. 18, 2018) (internal quotation marks and alterations omitted).

Courts in the Second Circuit consider three factors to determine whether a party has waived its right to arbitrate: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010). "Although litigation of substantial material issues may amount to waiver, delay in seeking arbitration does not create a waiver

---

First or Second Instances of the Software, which are related to the License Agreement, and each incorporates numerous paragraphs setting forth the parties' obligations under that Agreement. (AC ¶¶ 63, 71, 75, 79, 83, 87, 90.) (Plaintiff makes no argument that Count Three, which explicitly arises under the License Agreement, is not arbitrable.)

[10] I also do not reach the parties' arguments regarding the authenticity of the Confidentiality Agreement, (*see* Ds' Mem. at 16-18; P's Opp. at 14; Doc. 127 at 7), and whether, if authentic, it binds Defendants, (*see* Ds' Mem. at 14-16; P's Opp. at 19-22).

15

unless it prejudices the opposing party." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995) (citation omitted). Prejudice includes "substantive prejudice and prejudice due to excessive cost and time delay." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) (*per curiam*).

Plaintiff contends that Defendants waived any right "to compel arbitration by proceeding to litigate [Plaintiff's] claims on the merits for 40 months" through "invo[cation of] the judicial process . . . including by moving to dismiss on the merits, supplementing that motion, and also moving for sanctions." (P's Opp. at 22-23.) Here, due to the stay of more than twenty-six months, (*see* Minute Entry dated Apr. 28, 2016; Minute Entry dated Aug. 13, 2018), the parties had been in active litigation for fourteen months at the time of Defendants' pre-motion letter. This is well within the range of delays that have not resulted in waiver. *See, e.g.*, *Thyssen*, 310 F.3d at 105 (twenty-month delay); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 122 (2d Cir. 1991) (three-year delay); *Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457, 466 (2d Cir. 1985) (two-year delay).

As for whether the amount of litigation has prejudiced Plaintiff, here, Defendants moved to dismiss on November 5, 2015, (Doc. 70), after successfully defending against Plaintiff's motion for a preliminary injunction, (Minute Entry dated Sept. 3, 2015). I did not decide the motion to dismiss on the merits and stayed proceedings. (Minute Entry dated Apr. 28, 2016.) "[A] defendant does not waive arbitration merely by litigating a Rule 12(b)(6) motion." *Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F. Supp. 2d 211, 218 (S.D.N.Y. 2006) (citing *Sweater Bee*, 754 F.2d at 463). After I lifted the stay, (Minute Entry dated Aug. 13, 2018), Defendants promptly provided notice that it sought to move to compel arbitration by pre-motion letter dated August 24, 2018, (Doc. 106).

"The Second Circuit has generally found that a party waives its right to arbitrate when it engages in protracted litigation, such as extensive pre-trial discovery and substantive motions over the course of several months before seeking arbitration." *Katsoris*, 237 F. Supp. 3d at 101 (internal quotation marks omitted). "Minor proceedings, such as the filing of original pleadings and motions prior to any significant discovery, are not considered substantial litigation." *F.D. Imp. & Exp. Corp. v. M/V Reefer Sun*, 248 F. Supp. 2d 240, 249 (S.D.N.Y. 2002); *see S&R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83-84 (2d Cir. 1998) (affirming trial court finding waiver where, among other things, moving defendant invoked the right to arbitrate on the "eve of trial"); *Leadertex*, 67 F.3d at 26-27 (finding waiver where the moving defendant filed answer, amended answer, and answer to amended complaint, conducted discovery, and waited until trial was imminent to move to compel arbitration); *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991) (defendant "engaged in extensive pretrial litigation, apparently designed to wear down his opponent," filing several dispositive pretrial motions and appealing the denial of one to the U.S. Supreme Court). Accordingly, the amount of litigation in this case is not so substantial as to support the conclusion that Plaintiff was prejudiced by it.

Finally, PAS states it has "incurred more than $70,000 litigating its claims in this forum." (P's Opp. at 25.) But it makes no effort to delineate what portion of that expense is a result of Defendants' actions as opposed to its own (such as seeking a preliminary injunction). In any event, "pretrial expense . . . [,] without more, do[es] not constitute prejudice sufficient to support a finding of waiver." *Leadertex*, 67 F.3d at 26. PAS also asserts, without providing any specifics, that "[i]t is likely the delay has impaired PAS's ability to obtain discovery on issues concerning QBE's infringement of PAS's copyright." (P's Opp. at 25.) No such prejudice appears from the record.

17

Thus, Plaintiff has failed to show elapsed time, amount of litigation, or "proof of prejudice" sufficient to overcome the well-established preference for arbitration. *See La. Stadium*, 626 F.3d at 159.

## IV. **CONCLUSION**

For the reasons set forth above, QBE's motion to compel arbitration is GRANTED and this action is stayed. *See Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) ("[T]he Federal Arbitration Act requires a stay of proceedings when all claims are referred to arbitration and a stay requested.") (citation omitted). The Clerk of Court is directed to terminate the pending motion. (Doc. 120.) The parties are to provide a joint status letter within fourteen days of the conclusion of the arbitration.

**SO ORDERED.**

Dated: August 30, 2019
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.